THE STATE OF IOWA, Appellee, v. F. S. CRAFTON, Appellant.

1. **Criminal Law**: CHANGE OF VENUE: LOCAL PREJUDICE: SUFFICIENCY OF SHOWING. The defendant, on the eleventh day after being indicted for murder in the first degree, moved for a change of venue on the ground of the prejudice of the people of the county, and supported his motion by affidavits showing that, after the alleged murder, lengthy and sensational comments were published in the local daily papers, in which the defendant was denounced as a slayer and a villain, and in which it was charged that he had seduced the deceased; that his father had been guilty of a like offense to that charged in the indictment, and had been tried therefor; that the defendant had committed burglary and robbery, and had been implicated in stealing a diamond ring from the finger of the decedent after her death; that he killed the decedent to conceal the fact that she was pregnant by him; that he had murdered a man in another state, and was then a fugitive from justice; and that he was engaged in enticing women away for the purposes of prostitution. The state filed the counter affidavits of ten citizens, stating that they had read the newspaper accounts, or some of them, in relation to the alleged murder, and had heard the matter talked of some among the residents of the county, and, from what they had heard and read, they were of the opinion that there was no prejudice against the defendant. *Held*, that while the motion was addressed to the sound discretion of the court, it was error to overrule it upon the showing made.

2. ———: READING INDICTMENT TO JURY: ASSISTANT TO COUNTY ATTOR-NEY. The provision of the statute that the clerk or prosecuting attorney shall read the indictment and state the defendant's plea to the jury, is sufficiently complied with when that duty is performed by one who is assisting the county attorney, under the employment of private parties.

3. ———: CONDUCT OF COUNSEL: OPENING STATEMENT AND ARGUMENT: Counsel for the state, in the opening of a criminal trial, may properly state what, from all the circumstances, he in good faith expects to prove, even though it turns out that the evidence does not fully support his statement; and, in the argument, he may not only discuss the testimony, but may properly deduce therefrom facts which may be legitimately inferred from what appears in the record.

4. Criminal Evidence: MURDER: RES GESTÆ. On a trial for murder, the testimony of a policeman, who arrived at the scene of the homicide after it had been committed, as to what an eyewitness thereof said about it in the presence of the defendant, was admissible for the state, there being no evidence that the defendant was not in a condition to hear, or did not hear, what was said.

5. ———: ———: CONDUCT OF DEFENDANT. In such a case, evidence that, prior to the killing, the defendant slapped the decedent on the ear, and looked cross, was admissible to show the relations of the parties and their feelings toward each other.

6. ———: ———: CONDUCT AND RELATIONS OF PARTIES. In such case, evidence that, some days before the murder, the defendant introduced the deceased to the witness as his wife, and rented a room for their use, under a false name, and that the witness saw the deceased in bed with another man, and that the defendant was disrobed in the same room, was material to show the relations of the parties.

7. ———: ERROR CURED BY INSTRUCTION. When testimony erroneously admitted is taken from the jury by a proper instruction, the error is cured, and is no ground for a reversal.

8. Criminal Law: JURY IN CHARGE OF UNSWORN BAILIFF: NEW TRIAL. The requirement of section 4442 of the Code, that the jury, when it retires to deliberate upon its verdict, shall be in charge of a sworn officer, is mandatory; but the fact that the bailiff who had charge of the jury in a criminal case was not sworn is not ground for a new trial, under section 4489 of the Code, where there was no showing that any prejudice resulted to the defendant from the fact that the bailiff was not sworn.

*Appeal from Polk District Court.*—HON. C. P. HOLMES, Judge.

SATURDAY, OCTOBER 7, 1893.

THE defendant was indicted and tried for the crime of murder in the first degree, and convicted of murder in the second degree.   He was adjudged to be confined in the penitentiary at Anamosa for the term of fifteen years, and from that judgment this appeal is prosecuted.—*Reversed.*

*L. Kinkead, Hays Bros.*, and *Cole, McVey & Cheshire*, for appellant.

*John Y. Stone*, Attorney General, *W. A. Spurrier*, County Attorney, *C. A. Bishop* and *T. C. Dawson*, for the State.

KINNE, J.—I.   Mabel Swartz was, on the night of March 28, 1892, in a house of prostitution, in the city

1. CRIMINAL law: change of venue: local prejudice: sufficiency of showing.

of Des Moines, killed by the contents of a revolver, which was discharged while in the hands of, and being manipulated by, the defendant.   The grand jury returned an indictment against the defendant on May 9, 1892, and on May 12, 1892, the defendant waived arraignment, and on the twentieth of the same month entered a plea of not guilty.   On the same day he filed a petition and motion, supported by affidavits, for a change of place of trial.   The petition was grounded on the claim that excitement and prejudice existed to such an extent among the residents of the county that the defendant could not obtain a fair trial therein.   Many specific charges or statements were made in the showing, among the more important of which were the following: That, after the alleged murder, and without any foundation therefor, lengthy, sensational and unjustifiable comments were made and published in the newspapers of the city of Des Moines, which were circulated daily, and which contained serious and damaging charges against the defendant; that they denounced him as

being a slayer and a villain; charged that he had
seduced Mabel Swartz; that the defendant's father
had been guilty of a like offense, in the state of Illinois,
to that charged in the indictment, and that his father
was indicted and tried therefor; charged the defendant
with burglary and robbery, and with being implicated
in stealing a diamond ring from the finger of Mabel
Swartz after her death; that Mabel Swartz was preg-
nant with child, and that the defendant slew her to pre-
vent publicity of such fact; that the defendant had
murdered a man in Nebraska, and was then a fugitive
from justice; that the defendant was engaged in entic-
ing girls and women away for the purposes of prostitu-
tion.

The state resisted the application, and filed the
affidavits of ten men to its counter showing. The points
made in the resistance were, in brief, that the applica-
tion did not contain a statement of facts entitling the
defendant to the change; that the statements were mere
conclusions; that none of the articles referred to were
set out; that it did not appear that the articles so pub-
lished were all that were published by the local press;
that it did not appear that the comments of the press,
taken together, were not fair; that newspaper comments,
no matter of what character, would not justify a change
of venue; that the application was not made in good
faith, but for the purpose of delay. The ten citizens
swore that they had "read the newspaper accounts, or
some of them, in relation to the killing of Mabel Swartz
by F. S. Crafton," and had heard the matter talked
of some among residents of said county, and, from
what they had heard and read, they were of the opinion
that there was no prejudice against the defendant, and
that Ex-Mayor Swartz had no influence in Polk county.
The court overruled the motion, and the trial began in
the city where the alleged crime was committed, and
about sixty days after the tragedy had occurred.

The application for a change of venue is addressed to the sound discretion of the court. It is a judicial discretion, and not to be interfered with by us, unless it has been abused. *State v. Rowland*, 72 Iowa, 327; *State v. Beck*, 73 Iowa, 616; *State v. Cadwell*, 79 Iowa, 473; *State v. Woodward*, 84 Iowa, 172.

In the light of the facts above set out, and of the rule of law so wisely established, we are to determine whether or not the court erred in its ruling. We have in mind also that it is the policy of our law to make the execution of justice as speedy as is consistent with a due regard to the rights of a man charged with a grave crime. The resistance does not deny the publication of the articles as charged. It does not deny that they created a prejudice against the defendant, and that such prejudice existed after the killing. The denials of prejudice, as made, relate only to the time of the filing the affidavit of resistance. The only question in controversy between the two showings is, that the defendant's showing is that the excitement and prejudice continued to exist up to the time it was filed, while the state's showing is that it did not exist at that time. It was not incumbent upon the defendant to set out the newspaper articles, especially so as there is no denial that they were published as claimed by the defendant, and that they, for a time at least, had the effect which he claims. The question of prejudice is a question to be determined from facts before the court in the showings made. Now, it is clear that the showing of the defendant, in the absence of one made by the state, would have entitled him to the change. What facts, then, appear in the state's showing which would be held sufficient to overcome that made by the defendant? It does not appear that the state's affiants had read all, or even any, of the articles which contained the specific charges set out in the defendant's showing, and on which the change is prayed. There is not a fact which shows

that the change was sought for delay, and not in the best of faith. There is nothing to show what the opinion of the state's affiants is based upon, except that they had read "some" of the accounts of the killing, and had heard the matter talked of some among the residents of the county. Doubtless, there may be cases where such a counter, showing would be sufficient. That depends upon the facts stated by the other side. But we can not think that, in a case like this, where the defendant is charged with the commission of many and grave crimes, some of them of the most revolting character, the very charging of which was calculated to engender prejudice in the public mind, which would be deep seated and far reaching, such a showing in resistance of the application should be regarded as sufficient. The defendant was a comparative stranger in the city. His associates, to say the least, had been bad, and here was the press of the city poisoning the minds of the people against him by charging him with the commission of innumerable crimes.

Counsel for the state insist that this case is distinguishable from the cases of *State v. Canada*, 48 Iowa, 448, *State v. Nash*, 7 Iowa, 347, and *State v. Billings*, 77 Iowa, 417, in that, in the last two cases, it appeared that there had been threats of lynching made against the defendants, and in the *Canada case* no resistance was filed. These are distinguishing facts; but is public excitement and prejudice, which will prevent a defendant from having a fair trial, to be measured only by a single act in all cases, and that a threat? Must the court, in the exercise of its discretion, say that, because excitement and prejudice have not yet arrived at the point where threats to do personal violence to the person of the defendant are made, therefore it appears that prejudice does not exist? The admitted facts upon which the defendant's application is based, show, to our minds, that an opinion based thereon is

entitled to more weight than one based upon the meager facts stated in the state's showing. *State v. Beck*, 73 Iowa, 616. Each case must depend upon its own peculiar facts and circumstances. We know how difficult it is for an appellate court to see these matters as they may have appeared to the trial judge, and hence it becomes us to be exceedingly careful in passing upon the question of the proper exercise of the discretion vested in the trial court. When, after due investigation, we are satisfied that the trial court has made a mistake, it is our duty to rectify it as far as possible. The language of this court in the case of *State v. Nash, supra,* is applicable in this case. It was there said: "It is important, to maintain the usefulness of our judicial system, that no suspicion of influence from popular excitement in the administration of the law should be allowed to impair the public confidence in the fairness and impartiality of judicial proceedings. An excited state of public feeling and opinion is always the most unfavorable for the investigation of the truth. Not only should the mind of the juror be wholly without bias and prejudice, it should not only be free from all undue feeling and excitement in itself, but it should be, as far as possible, removed from the influence of prejudice and feeling and excitement in others." A man charged with the commission of the grave crime of murder has a right to be tried by an impartial jury, and in a community where his case has not been prejudiced and prejudged. It matters not what the standing or reputation of this defendant may be, or how low his condition, the law throws around him all the safeguards which the enlightened wisdom of the ages has shown essential to the safe, orderly, and impartial administration of justice. Considering the magnitude of the crime charged, the limited time between the homicide and the trial, the showing made for a change of venue, and the weakness

of the resistance, we are impressed with the conviction that the court below erred in overruling the defendant's motion.

Error is assigned on the court's ruling in refusing to continue the case. In the view we have taken on other questions presented, it is not necessary for us to consider this question.

II. A reversal is asked because Judge Bishop, who was appointed to assist the county attorney, read the indictment to the jury, and stated the defendant's plea. The statute provides that "the clerk or district (county) attorney must read the indictment, and state the defendant's plea to the jury." Judge Bishop was employed by private parties. The practice of allowing county attorneys the assistance of private counsel in the trial of criminal cases is of long standing in this state, and has been repeatedly sanctioned by this court. *State v. Fitzgerald*, 49 Iowa, 260; *State v. Montgomery*, 65 Iowa, 483; *State v. Shinner*, 76 Iowa, 147; *State v. Ormiston*, 66 Iowa, 143; *State v. Shreves*, 81 Iowa, 615. Judge Bishop, in reading the indictment and stating the plea to the jury, was acting as county attorney, and there was no error in his so doing.

*2. READING indictment to jury: assistant to county attorney.*

II. Much of the argument of counsel for the appellant is directed to alleged misconduct on the part of counsel for the state in their addresses to the jury. It is true that counsel referred to some matters not established by the testimony. In the opening of a case some latitude must be allowed counsel in stating what they expect to prove. That on the trial they may not be able to show all that they claimed is not necessarily an indication that the statement was not made in good faith. If, from all the circumstances it appears that the statement was made with a well-founded belief in its accuracy when made, it is all that can be required. It also

*3. ——: conduct of counsel: opening statement and argument.*

appears that both counsel for the state, in their closing arguments, went outside the record, and discussed matters not in evidence. It is the province of counsel not only to discuss the testimony, but they may properly deduce therefrom facts which may be legitimately inferred from what appears in the record. In some instances the objectionable statements seem to have been made by way of reply to what opposing counsel had said, and, in view of the entire record, we do not think that the defendant has any just ground of complaint touching this matter.

IV. It is claimed that the witness Scholes was permitted to detail to the jury conversations which occurred at the house where Mabel Swartz was killed, and which were no part of the *res gestæ*, and which were had in the defendant's absence. Scholes was a policeman, and arrived at the house after the shooting took place. He was called upon to state what was said, by the eyewitness to the tragedy, as to the circumstances under which it occurred. Some of his testimony was ruled out because the defendant was not present when the statements were made. The record shows that the court frequently admonished him to confine his statements to what was said when the defendant was present. The court seems to have exercised the utmost care in this respect. It is claimed that the defendant was in such a disturbed state of mind, and there was so much confusion, that he did not hear what was said. We think the claim is not well founded. The defendant was present, within hearing distance, and, for all that appears, his sense of hearing was not impaired. Under such circumstances, and in the absence of evidence to the contrary, it must be presumed that he did hear what was said.

4. CRIMINAL evidence: murder: res gestæ.

V. The witness Brandt testified that, several days prior to the shooting of Mabel Swartz, the defendant

5. ——: ——:
conduct of
defendant.

and Mabel were at his place, and that the defendant slapped Mabel on the ear, and that the defendant looked cross. His evidence was objected to as incompetent, irrelevant, and immaterial, and not a part of the *res gestæ.* We have no doubt that the evidence was admissible as tending to show the relations of these parties and their feelings toward each other. The testimony of the witness as to the looks or appearance of the defendant was admissible. It was touching a fact. How one looks is as much a fact as what one says or does. *State v. Cross,* 68 Iowa, 180.

VI. Mrs. Hunt testified that, on the Wednesday before Mabel was killed, the defendant and Mabel came

6. ——: ——:
conduct and
relations of
parties.

to her house, and he introduced her as his wife, and said his name was Hall, and he rented a room; that one day she saw Mabel in bed with a man named Kavanagh, and that the defendant was disrobed in the same room. It was proper to show the relations of the parties. Such relations often tend to show motive for the commission of a crime. *State v. Kline,* 54 Iowa, 183; *State v. Schaffer,* 70 Iowa, 371; *State v. Rainsbarger,* 74 Iowa, 196; *State v. Pugsley,* 75 Iowa, 743.

VII. One Wright was put upon the stand for the purpose of contradicting the witness Taylor's state-

7. ——: error
cured by
instruction.

ment as to threats of the defendant to kill Mabel Swartz. On cross-examination he was asked if he did not in the presence and hearing of one Hockersmith, on the day before, and in the court room, state that he had known the defendant well for the last four years, and that he knew of a good many scrapes he had been in, and told about his gambling,—about his being a gambler. He answered that he did not so state. Hockersmith was permitted to testify that Wright did make such statements to him. Wright had testified in chief, in sub-

stance, that he had not seen defendant for years until a short time before the trial. It was proper, therefore, to show that he had made a statement off of the stand not in accord with his testimony. What was said about the defendant being a gambler, or gambling, or being in scrapes, was wholly immaterial, and was an assault upon the defendant's character which was not in issue. This objectionable matter should not have been admitted, and, if it had rested there, we should be compelled to hold that it was such error as would justify a reversal on that ground. But the court, in an instruction to the jury, excluded from their consideration the objectionable portion of this evidence, and we do not think that the error was prejudicial.

VIII. It is urged that, as Joseph Shephard, the bailiff who had charge of this jury, was not specially sworn, as the law requires, such fact entitled the defendant to a reversal of the judgment. Shephard was appointed as bailiff at the January term, 1892, of the court, and then took the oath. He was reappointed at the April term at which this defendant was tried. He never took an oath with reference to this case. It does not appear what was the nature and conditions of the oath which he took in January, but it may be assumed that it was the same form of oath which is prescribed by law for his principal, the sheriff, as the statute provides that bailiffs shall be regarded as deputy sheriffs. Code, section 341. This is an oath to support the constitution of this state and that of the United States, and to faithfully and impartially, to the best of his ability, discharge all the duties of the office of bailiff. Code, sections 675, 676. Our statute also provides that, if the jury "do not agree without retiring, one or more officers must be sworn to keep them together in some private and convenient place without meat or drink, water excepted, and not to suffer any

8. CRIMINAL law: jury in charge of unsworn bailiff: new trial.

person to speak or communicate with them, nor speak to or communicate with them themselves, unless it be to ask them whether they have agreed upon their verdict, and not to communicate to anyone the state of their deliberation or the verdict agreed upon, until after the same shall have been declared in open court, and received by the court, and to return them into court when they shall have so agreed upon their verdict, unless by permission or order of the court, or they be sooner discharged." Code, section 4442.

The provision of this statute now under consideration is mandatory. The taking of a general oath of office by a bailiff is not a compliance with the law. If the record was silent as to the taking of an oath by the' bailiff, we would presume that he had complied with the law, and was properly sworn. *State v. Pitts*, 11 Iowa, 345. But in this case it is made to affirmatively appear that the bailiff was not sworn, as the law expressly requires. We have recently held that the provision of this same section requiring the jury to be kept together is mandatory. *State v. Fertig*, 84 Iowa, 79. In that case the court said: "These sections of the law were not intended as merely directory provisions. They appear to us to be absolute requirements, and we know of no reason why they may be ignored, unless their provisions are waived by the party on trial." The statute is absolute in its requirement that the jury shall be in charge of a sworn officer. It prescribes, as we have seen, the form of oath to be taken by him. No oath in anywise complying with the statutory requirement was taken by this bailiff. The oath provided by law is one of the means of protection which the legislature, in its wisdom, has guaranteed to one on trial for a crime. It is more than a mere matter of form; it is an essential requisite to the due and safe administration of justice, and it can not be dispensed with, except with the defendant's consent. While there

is some conflict in the decisions touching this point, we think by far the greater weight of authority sustains our holding. *Gibbons v. People*, 23 Ill. 518; *McIntyre v. People*, 38 Ill. 514; *Lewis v. People*, 44 Ill. 452; *McCann v. State*, 9 Smedes & M. 465; *Hare v. State*, 4 How. (Miss.) 187; *Commonwealth v. Shields*, 2 Bush, 81; *Brucker v. State*, 16 Wis. 333; *State v. Underwood*, 76 Mo. 630; 1 Bish. Crim. Proc., sections 991, 993; Whart. Crim. Pl., sections 728, 827; 2 Thomp. Trials, section 2548. Some of the cases which hold that a special oath need not be administered to the officer in charge of a jury were decided in states having no statute expressly requiring it. *Davis v. State*, 15 Ohio, 72.

The question then arises, is the failure to take the oath a ground for reversal of this case? The court below could only grant a new trial for some one of the causes provided by the statute. *State v. Bowman*, 45 Iowa, 418; *State v. Lee*, 80 Iowa, 75; *State v. Watson*, 81 Iowa, 380. The statutory grounds for a new trial, in brief, are: (1) Where the trial has been had in the absence of the defendant; (2) when the jury has received any evidence, paper, or document out of court not authorized by the court; (3) where they have separated without leave of court, after retiring to deliberate upon their verdict, or have been guilty of misconduct tending to prevent a fair trial; (4) when the verdict has been decided by lot; (5) where the court has misdirected the jury in a material matter of law; (6) when the verdict is contrary to the law or evidence; (7) when the court has refused to properly instruct the jury; (8) when from any other cause the defendant has not received a fair and impartial trial. Code, section 4489. It is not claimed that the jury were guilty of any misconduct; hence the only ground under which a new trial could be claimed is the eighth. But that can not avail the defendant, as there is no pretense, in so far as the matter now under consideration is concerned, that

the defendant has not had a fair and impartial trial. The bailiff in charge of this jury, so far as the record discloses, performed faithfully every duty which the law enjoins upon such an officer. He could have done no more had he taken the oath provided by law. No prejudice resulted from this neglect of duty. We are not authorized to go outside the statute to seek for grounds for a new trial. We are limited to those expressly given. It is clear, then, that the court did not err in refusing a new trial on this ground.

IX. The third paragraph of the court's charge to the jury reads: "If you have any reasonable doubt whether the defendant is guilty of *any one* of the crimes defined in these instructions, you should return a verdict of guilty of the next lower offense as to which no doubt exists in your minds." The words "any one" we have italicized. Counsel for appellant argue that, if the jury had reasonable doubt whether the defendant was guilty of "any one" of the crimes defined in the instructions, they should have acquitted the defendant. While we should not be willing to reverse this case for the alleged error in this instruction, in view of what is contained in other paragraphs of the charge, yet, as for other errors a new trial must be granted, it is proper for us to suggest that it is advisable to so frame the instruction on another trial as to avoid the objection urged.

X. It is insisted that the verdict is not sustained by the evidence. As for the refusal of the court to change the place of trial the judgment must be reversed, it would not be proper for us to discuss the testimony; and as a general rule, where a criminal cause is reversed upon another ground, we will not pass upon the sufficiency of the evidence to sustain the verdict, as on another trial it might be different. In this case, however, we think it proper to say that we could not sus-

tain a conviction for murder upon the evidence disclosed in the record before us.

Other errors are assigned to the action of the court in giving and refusing instructions. We think they are without merit. For the reasons heretofore given the judgment below is REVERSED.